

FILED by **CF** D.C.
ELECTRONIC
Jun 28, 2011
STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

**11-80109-CR-COHN/SELTZER**

CASE NO. _____

18 U.S.C. § 1341
18 U.S.C. § 1343
18 U.S.C. § 2

UNITED STATES OF AMERICA

vs.

JAMIE CAMPANY,

Defendant.

_____/

## INFORMATION

The United States Attorney charges that:

### GENERAL ALLEGATIONS

At various times relevant to this Information:

1. Barclay Trading Group, Inc. ("Barclay") and The Bullion Group, Inc. ("Bullion Group") were Florida corporations incorporated in April, 2006 and June, 2006, respectively. Each of these businesses conducted their operations from within the same facilities in West Palm Beach, Florida and shared common ownership, officers, employees, independent contractors, assets, liabilities and records. In July, 2006, Barclay registered "The Bullion Group" as a name under which it would conduct its business, such that these two businesses were thereafter effectively operated as a single entity (both referred to collectively herein as "Barclay").

2. Global Bullion Exchange, LLC ("Global") was a Florida limited liability corporation incorporated in April, 2007. Global conducted its business from within offices located in Lake Worth, Florida and was established as an entity separate and distinct from Barclay. In reality, Global

was the new operational face of Barclay and amounted to a continuation of Barclay's business, sharing common ownership, officers, employees, independent contractors, assets, liabilities and records. Global also conducted its business through certain branch offices and separately incorporated commercial entities which were independently owned and operated as its licensees.

3. Diversified Investment Group, Inc. ("Diversified") was a Florida corporation incorporated in July, 2003. During the relevant period, and commencing at least as early as April, 2007, Diversified operated its principal place of business from the same office in Lake Worth, Florida in which Global concurrently conducted its operations under Global's d/b/a, "Global Bullion Exchange." Diversified also shared common ownership and officers with Barclay and Global.

4. Throughout the period of the Barclay/Global business operation, funds were solicited from potential and existing investors with regard to certain "leveraged" investment offerings primarily related to the purported purchase of physical gold, silver, platinum and palladium bullion. Once funds had been received from solicited investors, commissions and fees were deducted. Thereafter, what remained of the investor-supplied proceeds was purportedly utilized to purchase precious metals through the assistance of certain so-called "clearing firms" with which both Barclay and Global claimed to have been associated through an alleged "introducing" relationship.

5. A "clearing firm" was a financial service business which had superior access to large-scale brokerages and major financial institutions, as well as various markets and related exchanges in which certain types of investment transactions were regularly conducted. In connection with the clearing firm business model, all of the necessary market and exchange-related transactions involved in the purchasing, selling, and trading of interests in applicable investment products were conducted on behalf of the clients of other investment firms (commonly referred to as "introducing" firms)

2

which did not have the same level or type of resource access as the clearing firm. Upon being acquired by the clearing firm in this manner, the introducing firm's clients' investment holdings (routinely referred to as "positions") were then held in connection with an "account" relationship.

6. Clearing firms could also loan funds to an introducing firm's clients via so-called "margin" financing privileges which were extended for the purpose of financing a portion of the client's total investment purchase. Accordingly, investors who availed themselves of this option provided only a fraction of the total cost of the purchased investment product, while the clearing firm financed the remainder of the purchase price, resulting in an investment purchase which was referred to as being "leveraged."

7. In order to secure against default by an investor to whom margin credit had been extended, a security interest was supplied by the investor allowing the clearing firm to hold the investor's account positions as collateral. Margin credit agreements between the lender and the investor also routinely stipulated that the total outstanding amount of an investor's debt could never exceed a certain percentage of the total value of the affected account positions. Thus, in the event of a decline in the market value of the investment product and/or the underlying investment item (*i.e.* gold, silver, etc.) resulting in a proportional decline in the investor's account value, margin credit agreements routinely provided that the investor would be required to supply additional cash "equity" to the lender so as to make up the difference. This process was commonly referred to as a "margin call" or "equity call."

8. Commencing in approximately May, 2007, Diversified purportedly operated as Global's so-called "clearing firm" and allegedly conducted market-related transactions and supplied purported margin credit financing for leveraged precious metal purchases by Global's clients. From

3

approximately May, 2006 through approximately April, 2007, Barclay had operated in a similar "introducing" capacity in tandem with a Miami-Dade County, Florida business which purportedly functioned as Barclay's so-called "clearing firm" (hereinafter referred to as the "earlier clearing firm").

9. Commencing in approximately September, 2006, the earlier clearing firm began delaying, and eventually ignoring, requests by Barclay's clients to sell ("liquidate") their precious metals investment holdings which were then being held as positions in their respective accounts. This resulted in Barclay's clients not receiving sales proceeds to which they were entitled, which in turn, gave rise to a growing level of complaints and threatened litigation directed toward Barclay.

10. Commencing in approximately November, 2006, in an attempt to stave off further complaints, litigation, and governmental enforcement action, Barclay began to satisfy its clients' account position liquidation requests even though it had not received the requisite sales proceeds from the earlier clearing firm. Since Barclay did not have the necessary funds on hand to cover these liquidation-related payments, Barclay instead made the payments with funds obtained from Barclay's newer investors, who had more recently supplied funds to Barclay also for the purpose of making leveraged precious metals purchases. This same strategy was continued after Global had supplanted Barclay and also was used by Global as the means by which Global satisfied its earlier clients' liquidation requests, since Global had commenced its operations while in a state of insolvency and negative cash flow inherited from Barclay.

11. Defendant **JAMIE CAMPANY**, a resident of Palm Beach County, Florida, was the sole owner and principal officer of Barclay, Bullion Group, Global, and Diversified. In this capacity, **CAMPANY** controlled, managed and ran the day-to-day business operations of each firm.

## COUNTS 1-5
## Mail Fraud
## (18 U.S.C. § 1341)

1. Paragraphs 1 through 11 of the General Allegations section of this Information are realleged and incorporated by reference as though fully set forth herein.

2. From in or around at least as early as April, 2006, to in or around January, 2010, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

### JAMIE CAMPANY,

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

### PURPOSE OF THE SCHEME AND ARTIFICE

3. It was the purpose of the scheme and artifice for defendant **JAMIE CAMPANY** to defraud investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises in connection with alleged precious metals-related investments by: (a) soliciting and causing others to solicit millions of dollars in funds from the investors under false pretenses consisting of materially false statements and omissions of material facts; (b) intentionally failing to utilize investors' funds in the manner which had been promised; (c) misappropriating and converting investors' funds to **CAMPANY's** own benefit and the benefit of others without the knowledge or authorization of the investors; and (d) engaging in other activities which were designed to fraudulently conceal **CAMPANY's** commission of such conduct.

## SCHEME AND ARTIFICE

The manner and means by which the defendant sought to accomplish the purpose of the scheme and artifice to defraud included, among others, the following:

4.  Barclay and, in succession, Global (hereinafter referred to collectively as "Barclay/Global" or by individual name where appropriate), through the actions of their owner and corporate officer, **JAMIE CAMPANY**, enticed and induced potential and existing client/investors ("investors") to participate in a program routinely referred to as the "Leveraged Precious Metals Investment Program" (the "Leverage Program"). Through the Leverage Program, which was designed, implemented, operated, managed, and controlled by **CAMPANY**, it was represented by **CAMPANY** and by certain sales personnel acting at **CAMPANY's** direction and under his supervision, that the investors could finance up to 80% of the total value of the precious metals-related investments ("total metal value") being offered. These investments were represented to consist of physical bullion identified and valued upon the basis of weight increments. Moreover, it was further represented that the precious metals purchased by the investors in this manner would be kept and securely stored within a storage facility operated by a third party.

5.  In order to participate in the Leverage Program, investors would be required to pay the following amounts:

    a.  funds amounting to twenty percent (20%) of the total metal value, which funds Barclay/Global would then purportedly use, coupled with additional margin credit funds obtained from an independent clearing firm or other third party lender, so as to make up the remainder, such that the contemplated full total metal value purchase could be accomplished;

6

b.      fifteen percent (15%) of the total metal value as a "management fee" or "trading fee," which was, in character, synonymous with a commission payment;

c.      three percent (3%) of the total metal value as a "spread fee" or "markup," ostensibly to cover charges that would be passed on by a clearing firm allegedly involved in conducting necessary transactions, in order to compensate the clearing firm for its services;

d.      a nominal account opening fee;

e.      interest accrued and to be paid periodically upon that portion of the total metal value which would purportedly be acquired through leverage and necessary margin credit financing; and

f.      additional equity funds which may be required upon future occasions during the account relationship, but only in the event that the market value of the investor's account positions dropped below a certain loan-to-value level to the extent that a margin call or equity call would be necessitated.

5.      In further pursuit of his scheme to fraudulently induce investors to supply funds in connection with the Barclay/Global Leverage Program, **JAMIE CAMPANY** conceived, implemented, and conducted a broad-scale telemarketing operation which made use of both conventional and voice-over-internet-protocol ("VOIP") phone systems, sales "lead" databases, automated phone dialing systems, and sophisticated internet websites.

6.      **JAMIE CAMPANY** also employed the services of numerous individual commission-based sales personnel who would operate as independent sales agents or employees of Barclay and/or Global or act in a similar capacity through one of Global's affiliated licencee businesses. Acting at **CAMPANY's** direction and under his supervision, these individuals would, through their telephone solicitations originating within the Southern District of Florida, directly

induce investors residing both within and outside the State of Florida to supply funds in connection with the Barclay/Global Leverage Program, as well as induce the investors to supply such funds through telemarketing-related contacts and communications, including the dissemination of information through targeted electronic advertising media and other forms of interstate and intrastate wire communications such as fax transmissions and internet e-mail systems linked to websites which had been established by both Barclay and Global.

7. In further pursuit of his scheme to fraudulently induce investors to supply funds, **JAMIE CAMPANY** conceived, implemented, and conducted a dissemination and delivery system which communicated information concerning the Leverage Program through various types of printed solicitation and advertising materials, as well as investment offering and transactional materials, all of which were designed to convince and facilitate investors to supply funds to Barclay/Global in connection with the Leverage Program. These same materials were supplied through deliveries made by the United States Postal Service and private and commercial carriers, as well as through the aforementioned wire communication methods.

8. To fraudulently induce investors to supply funds and participate in the Leverage Program, **JAMIE CAMPANY**, through and within the above-described information, solicitation materials, and communication and delivery mechanisms, both made, and caused to be made by sales personnel acting at his direction, numerous materially false statements to said investors, and concealed and omitted to state, and caused to be concealed and omitted to be stated by the aforementioned sales personnel, numerous material facts to the investors which included, among others, the following:

8

## Materially False Statements

a. That precious metals-related investment products, consisting of physical precious metal bullion identified in weight increments and stored at certain storage facilities, would be purchased and acquired through the efforts of a third-party clearing firm, when, in truth and in fact, no such physical bullion nor other precious metals-related investment would ever be purchased and acquired, whether through a clearing firm or otherwise, for the overwhelming majority of investors;

b. That investors' funds would be used for the purpose of purchasing and acquiring their individual precious metals, when, in truth and in fact, the funds thus provided by the investors were being used for other unauthorized purposes unbeknownst to the investors, including: (a) satisfaction of account position liquidations demanded by earlier-solicited investors, many of whom also had acquired no precious metals or precious metals-related investments in connection with funds which they had earlier supplied; (b) settlement of pending and threatened lawsuits brought by earlier investors; (c) commission payments paid to sales personnel in connection with previous purported precious metals purchases made by earlier investors, most of which "purchases" were, likewise, fictitious; (d) payments of personal and business expenses far in excess of that portion of the investors' funds, if any, which Barclay/Global was entitled receive in connection with its share of applicable commissions and fees; and (e) intermittent token purchases of relatively small amounts of physical precious metals upon a sporadic basis, which precious metals were not acquired for the benefit of any particular investor, but merely acquired by **JAMIE CAMPANY** strictly for his own individual benefit and/or for the purpose of conveying false appearances in order to assist in the further concealment of his fraudulent scheme;

c. That the commissions deducted from investor-supplied funds were appropriately

9

charged as a percentage of the total metal value purportedly purchased in connection with services supplied by Barclay/Global and its associated sales personnel, when, in truth and in fact, such commissions were charged and deducted from investor-supplied funds without any service whatsoever being performed due to the fact that, in all but a relatively minor number of instances, no precious metals nor precious metals-related investments were ever purchased or acquired;

 d. That the leveraged portions of the precious metals purportedly purchased and acquired for the investors participating in the Leverage Program were financed and made possible as a result of margin credit extended by a clearing firm or some other financing source, when, in truth and in fact, no credit of this nature was ever extended, since, in all but a relatively minor number of instances, no precious metals nor precious metals-related investments, leveraged or otherwise, were ever purchased or acquired;

 e. That accrued interest was appropriately charged to the investors at the stated interest rate in connection with purported margin credit which had been extended to investors participating in the Leverage Program, when, in truth and in fact, no such credit was ever extended, since, in all but a relatively minor number of instances, no precious metals nor precious metals-related investments, leveraged or otherwise, were ever purchased;

 f. That margin calls or equity calls directed against individual Leverage Program investors as a consequence of alleged depreciated account values due to market declines were appropriate and that the additional equity funds requested from investors purportedly affected by such margin calls were legitimately due and owing when, in truth and in fact, such account value declines had not occurred to the extent claimed, or no decline had occurred at all, since no margin credit had been extended to the investors due to the fact that, in all but a relatively minor number of

instances, no precious metals nor precious metals-related investments, leveraged or otherwise, were ever purchased;

  g. That purported account statements, trade confirmations, invoices, and other records routinely generated by Barclay/Global reflected accurate information concerning such material account information as: (a) amounts of physical metal held on account as investment positions for the investor; (b) value of account positions based upon current market values regarding the type of metal in question; (c) outstanding loan balances owed as a result of margin credit extensions, as well as material transactional details such as: (1) dates of each purported precious metal purchase; (2) prices per applicable unit of measurement in connection with such purchase; (3) weight amounts purchased; (4) margin credit amounts ("loan" amounts) extended in connection with applicable purchases; and (5) commissions charged in connection with said purchases. Statements concerning these and other such material matters were, in truth and in fact, demonstrably false for the reasons specified previously herein.

### Concealment and Omission of Material Facts

  h. That, commencing as early as August, 2006, and consistently thereafter throughout Barclay's period of operation, Barclay was experiencing inexplicable delays and eventual total failures on the part of the earlier clearing firm with regard to honoring requests being made by numerous Barclay investors for the timely sale of all, or portions of, their precious metals positions, which resulted in either total failure on the part of the earlier clearing firm to supply the required amount of cash proceeds generated from these requested sales, or failure to supply said funds in a timely fashion;

  i. That, commencing as early as November, 2006 and consistently thereafter

Barclay/Global effectively lost its access to margin credit financing for its investors, nor did it have the assets, nor the ability, to make loans, or obtain loans from any clearing firm or other financing source on behalf of its investors, despite the fact that such loans were absolutely necessary to make possible the purchase of precious metals in the manner expressly described in connection with the Leverage Program;

j.   That, commencing as early as November, 2006 and consistently thereafter, account position liquidation and sales requests by investors seeking to sell all, or portions of, their purported precious metals positions were being satisfied, and resultant purported sales proceeds were being supplied to said investors making such requests, not by funds generated as a result of the sales of these investors' precious metals positions but, rather, through funds supplied by other more currently solicited investors who had recently been convinced to supply funds for the express purpose of acquiring investments in precious metals consistent with the process described in the Leverage Program;

k.   That, commencing as early as November, 2006 and consistently thereafter, investor-supplied funds provided by more recently-solicited investors were not being utilized in the manner described to those investors, but were being used for other unauthorized purposes unbeknownst to said investors, including: (a) satisfaction of account position liquidations demanded by earlier-solicited investors, many of whom also had acquired no precious metals or precious metals-related investments in connection with funds which they had earlier supplied; (b) settlement of pending and threatened lawsuits brought by earlier investors; (c) commission payments paid to sales personnel in connection with previous purported precious metals purchases made by earlier investors, most of which "purchases" were, likewise, fictitious; (d) payments of personal and business expenses far in

excess of that portion of the investors' funds, if any, which Barclay/Global was entitled receive in connection with its share of applicable commissions and fees; and (e) intermittent token purchases of relatively small amounts of physical precious metals upon a sporadic basis, which precious metals were not acquired for the benefit of any particular investor, but merely acquired by **JAMIE CAMPANY** strictly for his own individual benefit and/or for the purpose of conveying false appearances in order to assist in the further concealment of his fraudulent scheme;

l.    That, commencing as early as November, 2006 and consistently thereafter, the Barclay/Global business was undercapitalized and effectively insolvent since, due in large part to the above-described practices, the business' assets never exceeded its liabilities, particularly as a consequence of the significant amounts which were owed to more recently solicited investors whose funds were never invested but were, instead, used to pay sales proceeds and cover other liabilities owed to earlier investors;

m.    That, commencing as early as April, 2007 and consistently thereafter, Diversified, which had been represented to investors as the purported third-party clearing firm with which Global claimed to be associated, was nothing more than a shell company wholly-owned and operated by **JAMIE CAMPANY**, and established for no other purpose than to take receipt of investor-supplied funds and to thereafter misappropriate them in the manner described herein, which funds were then being supplied by Global's investors for the express purpose of obtaining precious metals consistent with the process described in the Leverage Program;

n.    That, commencing as early as April, 2007 and consistently thereafter, investor-supplied funds received by Global were rarely, if ever, utilized to purchase any precious metals or precious metals-related investments on behalf of any of its individual investors and, in fact, in all but

a relatively minor number of instances, no metals nor precious metals-related investment products, leveraged or otherwise, were ever acquired on behalf of any individual investor, either by the business directly, or through transactions conducted by any purported clearing firm, including Diversified;

o.  That, commencing as early as April, 2007 and consistently thereafter, Diversified, which was the purported source of margin credit financing for investments made by Leverage Program investors, had never extended any credit to the investors, either in its own right or through credit obtained from any other credit provider, since, in all but a relatively minor number of instances, no precious metals nor precious metals-related investment products, leveraged or otherwise, were ever acquired on behalf of any of Global's investors;

p.  That, on December 29, 1999, the National Futures Association ("NFA") (the national self-regulatory organization for the Unites States futures industry) issued a Complaint to **JAMIE CAMPANY** and others for "deceptive and misleading sales solicitations" and ordered **CAMPANY** suspended from NFA membership and association for six months, effective May 1, 2000, or to pay a $7,500 fine;

q.  That, on January 9, 2009, **JAMIE CAMPANY** and Global were both the subject of a "Desist and Refrain Order" issued by the State of California Corporations Commissioner which made findings that **CAMPANY** and Global had acted in violation of California law, in that an individual associated with Global, who was acting under **CAMPANY's** supervision and control, unlawfully solicited, offered, and sold, to at least one California resident, precious metals-related investments, while neither this same individual, nor **CAMPANY**, nor Global, were registered or licensed in the State of California as required by California law; and

14

r. That, commencing in or about March, 2008, a Global sales agent, who had been promoted, with primary responsibility for establishing and supervising Global licensee and branch office operations, was a convicted felon, having been convicted and sentenced for the offense of Conspiracy to Commit Securities, Mail, and Wire Fraud in the United States District Court for the Southern District of Florida on June 15, 2001.

9. As part of the scheme and artifice, **JAMIE CAMPANY** eventually succeeded in inducing investors, and causing the inducement of investors, to supply funds to the Barclay/Global business operation through interstate wire transfers from financial institutions located within and outside the State of Florida to bank accounts controlled by **CAMPANY** and maintained at financial institutions within the Southern District of Florida, as well as through mailings and deliveries by the United States Postal Service and private and commercial interstate carriers which contained checks from investors representing funds which they had been induced to provide, which checks were eventually deposited in the aforementioned bank accounts controlled by **CAMPANY**.

## USE OF THE MAILS

10. On or about the dates specified below as to each count belw, the defendant, **JAMIE CAMPANY**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly cause to be delivered by the United States Postal Service and a private and commercial carrier, according to the directions thereon, the items identified in each count below:

| COUNT | APPROX. DATE | DESCRIPTION OF MAILING |
|---|---|---|
| 1 | June 18, 2008 | Check in the amount of $101,000 sent via FedEx from investor WL in Ohio to Global Bullion Exchange in Lake Worth, FL. |
| 2 | May 5, 2009 | Check in the amount of $6,000 sent vi FedEx from investor RS in Indiana to Global Bullion Exchange in Lake Worth, FL. |
| 3 | June 2, 2009 | Check in the amount of $3,000 sent via FedEx from investor BC in Texas to Global Bullion Exchange in Lake Worth, FL. |
| 4 | July 6, 2009 | Check in the amount of $1,400 sent via FedEx from investor BC in Texas to Global Bullion Exchange in Lake Worth, FL. |
| 5 | October 19, 2009 | Check in the amount of $3,000 sent via FedEx from investor TS in Indiana to Global Bullion Exchange in Lake Worth, FL. |

In violation of Title 18, United States Code, Sections 1341 and 2.

## COUNTS 6-9
## Wire Fraud
## (18 U.S.C. § 1343)

1. Paragraphs 1 through 11 of the General Allegations section of this Information are realleged and incorporated by reference as though fully set forth herein.

2. From in or around at least as early as April, 2006, to in or around January, 2010, in Palm Beach County, in the Southern District of Florida, and elsewhere, the defendant,

**JAMIE CAMPANY,**

did knowingly, and with intent to defraud, devise, and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that the pretenses, representations, and promises were false and fraudulent when made.

16

## PURPOSE OF THE SCHEME AND ARTIFICE

3. Paragraph 3 of Counts 1 through 5 of this Information is re-alleged and incorporated by reference as though fully set forth herein as a description of the purpose of the scheme and artifice.

## SCHEME AND ARTIFICE

4. Paragraphs 4 through 9 of Counts 1 through 5 of this Information, including all sub-paragraphs designated thereunder by letter, are re-alleged and incorporated by reference as though fully set forth herein as a description of the scheme and artifice.

## USE OF THE WIRES

5. On or about the dates specified below as to each count below, the defendant, **JAMIE CAMPANY**, for the purpose of executing and in furtherance of the aforesaid scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and attempting to do so, did knowingly transmit and cause to be transmitted in interstate commerce by means of wire communication certain writings, signs, signals, pictures, and sounds, as more particularly described in each count below:

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 6 | May 23, 2008 | Wire transfer from investor EB's Commerce Bank business checking account number **********5989 in New Jersey, in the amount of $8,500 to Global Bullion Exchange LLC's Wachovia Bank account number **********6062 in Palm Beach County in the Southern District of Florida. |

| COUNT | APPROX. DATE | DESCRIPTION OF WIRE COMMUNICATION |
|---|---|---|
| 7 | January 30, 2009 | Wire transfer from investor DH's U.S. Bank checking account number **********4656 in Iowa, in the amount of $15,500 to Global Bullion Exchange LLC's Wachovia Bank account number **********6062 in Palm Beach County in the Southern District of Florida. |
| 8 | August 31, 2009 | Wire transfer from investor JP's Chase Bank checking account number ********** in Texas, in the amount of $10,000 to Global Bullion Exchange LLC's Wachovia Bank account number **********6062 in Palm Beach County in the Southern District of Florida. |
| 9 | November 25, 2009 | Wire transfer from investor AA's Bank of America checking account number **********9252 in New Jersey, in the amount of $50,000 to Global Bullion Exchange LLC's Wachovia Bank account number **********6062 in Palm Beach County in the Southern District of Florida. |

In violation of Title 18, United States Code, Sections 1343 and 2.

WIFREDO A. FERRER
UNITED STATES ATTORNEY

PETER B. OUTERBRIDGE
ASSISTANT UNITED STATES ATTORNEY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| UNITED STATES OF AMERICA | CASE NO. _____ |
|---|---|
| vs. | |
| JAMIE CAMPANY, | **CERTIFICATE OF TRIAL ATTORNEY*** |
| Defendant. _____/ | Case Superseding Information: |

**Court Division**: (Select One)

___ Miami ___ Key West
___ FTL  _X_ WPB  ___ FTP

New Defendant(s)  Yes ___  No ___
Number of New Defendants ___
Total number of counts ___

I do hereby certify that:

1. I have carefully considered the allegations of the indictment, the number of defendants, the number of probable witnesses and the legal complexities of the Indictment/Information attached hereto.

2. I am aware that the information supplied on this statement will be relied upon by the Judges of this Court in setting their calendars and scheduling criminal trials under the mandate of the Speedy Trial Act, Title 28 U.S.C. Section 3161.

3. Interpreter: (Yes or No)  _No_
   List language and/or dialect  _____

4. This case will take  _0 (Plea)_ days for the parties to try.

5. Please check appropriate category and type of offense listed below:

   (Check only one)                           (Check only one)
   I   0 to 5 days     _X_                    Petty    ___
   II  6 to 10 days    ___                    Minor    ___
   III 11 to 20 days   ___                    Misdem.  ___
   IV  21 to 60 days   ___                    Felony   _X_
   V   61 days and over ___

6. Has this case been previously filed in this District Court? (Yes or No)  _No_
   If yes:
   Judge: _____  Case No. _____
   (Attach copy of dispositive order)
   Has a complaint been filed in this matter? (Yes or No)  _No_
   If yes:
   Magistrate Case No. _____
   Related Miscellaneous numbers: _____
   Defendant(s) in federal custody as of _____
   Defendant(s) in state custody as of _____
   Rule 20 from the _____ District of _____

   Is this a potential death penalty case? (Yes or No)  _No_

7. Does this case originate from a matter pending in the Northern Region of the U.S. Attorney's Office prior to October 14, 2003?  ___ Yes  _X_ No

8. Does this case originate from a matter pending in the Central Region of the U.S. Attorney's Office prior to September 1, 2007?  ___ Yes  _X_ No

PETER B. OUTERBRIDGE
ASSISTANT UNITED STATES ATTORNEY
Bar No. 0289914

*Penalty Sheet(s) attached

REV 4/8/08

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

PENALTY SHEET

**Defendant's Name**: JAMIE CAMPANY

**Case No**:

Count #'s: 1 - 5

Mail Fraud

18 U.S.C. § 1341

**\* Max.Penalty**: 20 years' imprisonment

Count #'s 6 - 9:

Wire Fraud

18 U.S.C. § 1343

**\*Max. Penalty:** 20 years' imprisonment

Count #:

**\*Max. Penalty:**

Count #:

**\*Max. Penalty:**